# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### APRIL SESSION, 1998

STATE OF TENNESSEE,    )
    )
       Appellee    )
    )
vs.    )
    )
QUINCY L. HENDERSON,    )
    )
       Appellant    )

No. 02C01-9706-CR-00227

SHELBY COUNTY

Hon. Carolyn Wade Blackett, Judge

(Premeditated First Degree Murder)

FILED

May 12, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

For the Appellant:

**Kathleen L. Caldwell**
Taylor, Halliburton, Ledbetter
  & Caldwell
44 North Second, Suite 200
Memphis, TN 38103

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Douglas D. Himes**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

**William L. Gibbons**
District Attorney General

**Reginald Henderson**
Asst. District Attomey General
Criminal Justice Complex
Suite 301, 201 Poplar Street
Memphis, TN 38103

OPINION FILED: _____

REVERSED AND REMANDED

**David G. Hayes**
Judge

**OPINION**

The appellant, Quincy L. Henderson, was sentenced to a term of life imprisonment following his conviction by a Shelby County jury for the premeditated first degree murder of Demetrius Moten. In this appeal as of right, the appellant contends that:

> I. The trial court erred by admitting photographs into evidence not disclosed during pre-trial discovery;
>
> II. The appellant's pre-trial confession was obtained in violation of his Fifth Amendment rights and its admission constitutes reversible error; and
>
> III. The evidence is not sufficient to uphold a conviction for premeditated first degree murder.

After a review of the record and the applicable law, we find the evidence insufficient to support a conviction for premeditated first degree murder. Accordingly, we vacate the judgment of conviction and sentence entered by the trial court. However, we do find the evidence sufficient to support a conviction of second degree murder. This case is remanded to the trial court for proceedings consistent with this opinion.

**Background**

On July 7, 1995, Demetrius Moten and her four children visited with family and friends in the Dunnavant Street area of Memphis. Later that afternoon, Ms. Moten was at the residence of her uncle, Orange Williams, who lived in the Dunnavant Manor Apartments. At 7:00 p.m., she announced to her uncle and Jerry Herron, a friend, that she was hungry and was going to get a sandwich. Orange Williams gave Demetrius ten dollars and asked her to bring him back a cheeseburger. Shortly thereafter, she was observed at a neighborhood bar and grill, known by the local residents as "Sam's

Club."[1]  While in the club, Julius Moten, Demetrius' father, saw his daughter drinking a beer at the club with some of her cousins and friends.  He recalled that he instructed his daughter to go home to her children.

Between 8:30 and 9:00 p.m., William Baker and Yolanda Cribbs each saw Demetrius and the appellant leaving Sam's Club together.[2]  The two were walking toward the Dunnavant Manor Apartments.  Demetrius was carrying a brown paper bag in her left hand.   "[The appellant] put his arm around her . . .like . . .hugging, but no . . .she wasn't hugging back."  From across the street, Baker overheard the two discussing a ten dollar bill and observed that the appellant appeared to be attempting to take the brown paper bag away from Demetrius.  Ms. Cribbs stated that "they were not fighting or struggling in any way."  She explained that it appeared as if the appellant and Demetrius were hugging, and, because she knew they were friends, she did not think anything about it.  Baker also noticed that the appellant was wearing white, black, and green Nike tennis shoes.  Both Baker and Cribbs watched the two walk toward the Dunnavant Manor Apartments, but neither noticed whether they ever entered an apartment.

When several hours had passed and Demetrius had not returned to Williams' apartment, Williams and Herron began to look for her.  A neighbor told Williams that Demetrius and the appellant had walked toward the woods behind the apartment complex.  Williams and Herron went to the back of the apartment building and began calling for Demetrius, but received no response.  Williams then shouted, "If I start shooting out there, somebody is gonna say something."  Williams and Herron then heard what they thought to be someone running through the woods.  Because it was

---

[1]We acknowledge conflicts in the testimony of the witnesses presented at trial with regard to the approximate time of events and other minor details.  Rather than recite the testimony of each individual witness, we summarize the facts surrounding this offense in the light most favorable to the State.

[2]The proof established that the thirty-four year old Demetrius and the eighteen year old appellant were friends and had known each other their entire lives as they grew up in the same neighborhood.

3

dark, the two men decided not to go into the woods and returned to Williams' apartment.

The next morning, between 7:30 and 8:30 a.m., Jerry Herron and Orange Williams renewed their search for Demetrius when they realized that she had never returned from Sam's Club. The two men found the lifeless body of Demetrius Moten in the woods behind the Dunnavant Manor Apartments. The Memphis Police Department was then notified.

Officer Sheryl Stanback was the first officer to arrive at the scene. Officer Stanback, who was later joined by Sergeant Richard Roleson, proceeded to secure the crime scene and interviewed available witnesses. Although there were no eyewitnesses to the apparent homicide, the information provided by the witnesses placed the appellant as the last person seen with Demetrius Moten the previous evening. Based upon this information, Memphis police officers proceeded to the appellant's residence.

Upon obtaining a consent to search by the appellant's mother, Addie Henderson, police officers found a pair of white, green and black Nike tennis shoes soaking in a bucket of bleach and dishwashing liquid in the sink.[3] They also discovered a bloody sock in a garbage can.[4] The appellant was then transported to the homicide bureau of the Memphis Police Department.

After waiving his constitutional rights, the appellant provided a statement to the police in which he confessed to the murder of Demetrius Moten. In his confession, the appellant explained that he had asked Demetrius if she wanted to have sex and she

---

[3]The appellant's mother testified that she routinely soaked the appellant's shoes in bleach water because of a foot odor problem.

[4]The appellant's mother also explained that the substance which appeared to be blood on his sock was actually rust.

4

responded that she did. The two then went into the woods behind the Dunnavant Manor Apartments. After engaging in sexual intercourse, the appellant asked Demetrius for a dollar, to which she responded, "Ain't fixing to give you shit." The appellant asked again, and this time, Demetrius gave the appellant what she thought was a one dollar bill, but was actually a ten dollar bill. When she realized her mistake, Demetrius asked the appellant to return the ten dollar bill. A fight ensued between the two.

> That's when I took the stick -- the first time I hit her with the stick. And after I hit her with the stick, I got scared, and I didn't know what to do. That was about all by then. I got scared, continuously hitting her. So, when I heard this dude -- I heard some guy holler "Peaches," and I ran home.

He explained that, at the time of the encounter with Demetrius, he was under the influence of " [a] lot of alcohol, just a little weed." The appellant, at some point later in the evening, purchased "some weed" with the money he took from the victim. In his statement, the appellant also informed the detectives of the location of the "stick" used in the murder.[5] Subsequent police investigation confirmed the location of the "stick."[6]

An autopsy was performed on the victim's body at 11:25 a.m. on July 8, 1995. Despite information from the police that the victim had been shot, Dr. O.C. Smith's examination revealed no gunshot wounds. Rather, he determined that the five foot four inch eighty-six pound victim had suffered "blunt trauma to her head and neck," resulting in her death.[7] He explained that

> Miss Moten had injuries over many areas of her body. The most severe injury was limited to the head and neck region. It included multiple bruises, multiple skin scrapes or abrasions, multiple lacerations or skin tears to the scalp and face. These were fairly extensive -- predominately on the right side of the face and scalp. They were as a result of blows

---

[5]Prior to the appellant's confession, the police were under the belief that the victim's death had resulted from a gun shot wound.

[6]A photograph of the stick was introduced at trial. Although no description of the "stick" is contained in the record, the photograph depicts a small tree limb, slightly larger than a broom handle. The appellant stated that the "stick" broke in two during his attack of the victim.

[7]Dr. Smith estimated that, at a minimum, approximately ten separate blows were inflicted to the head and neck region.

applied by a moving object against the face. This caused bruising of the brain internally.

Dr. Smith testified that the "stick" found at the crime scene could have caused the injuries to the victim's head and neck. Additionally, he stated that a "crushing force" was applied to the victim's chest wall, inhibiting the victim's breathing. This injury could not be caused by a stick; but would be consistent with someone kneeling on the victim's chest. He determined that death occurred between 5:25 p.m. and 11:25 p.m. on July 7, 1995. Dr. Smith further testified that "[the victim] had a blood alcohol level of .29 grams per deciliter of ethyl alcohol," "a very high level." He interpreted the level to mean that "Miss Moten would have diminished capacities in regard to her judgment and her reaction time. She would definitely be impaired for almost all of the major physical and mental processes that a person would have to undertake." Dr. Smith was unable to either confirm or dispute the appellant's statement that he and the victim had engaged in sexual intercourse immediately preceding her death. No evidence of any defensive or offensive type of injuries were observed on the victim.

Notwithstanding the appellant's previous confession to the police, at trial the appellant denied ever making such statement. In fact, his testimony at trial, offers a completely different version of the events. The appellant stated that he first saw Demetrius around 7:00 p.m. when she informed him that she was going to Sam's Club to get a sandwich. He accompanied Demetrius to the club, but did not enter the club with her. Rather, the appellant remained outside talking with "O.W." for about an hour and one-half. The appellant maintains that the last time he saw Demetrius was when she entered the club. Additionally, although their testimony was somewhat contradictory, the appellant's mother and brother attempted to establish an alibi for the appellant. The appellant's mother and brother recalled that the appellant was present in his mother's house from 9:00 p.m. on the night of the murder until the next morning when the police arrived.

6

Based upon this evidence, the jury found the appellant guilty of premeditated first degree murder.

## I. Failure to Produce Photograph's During Discovery

The appellant argues that the trial court erred by permitting introduction of photographs not disclosed by the State prior to trial.[8] Consequently, he states that, due to the nature of the photographs, he was prejudiced by the discovery violation. The State asserts that no discovery violation occurred.

The appellant contends that, although defense counsel timely requested, pursuant to Rule 16, all photographs in the possession of the State, the prosecution never disclosed the photographs prior to trial.[9] In response to this allegation, Assistant District Attorney Henderson stated that defense counsel

> was set to receive discovery in my office on September the 5th, 1996. [Defense counsel] did not show up. We got in further contact – had another date several weeks later. [Defense counsel] did not show up, but she sent her, at that time, law clerk. And he received the discovery from me.

The prosecutor, in arguing the State's position, explained:

> Your Honor, there's no duty for me to produce this photograph. This is not discoverable. She can go to the photo lab and get this photograph just like I can. There's no duty to do that. And she can't show me where there is. We have never done that in any trial due to photographs, you

---

[8]At trial, the State sought admission of photographs taken at the crime scene and at the appellant's home, *i.e.*, Exhibits 2 - 9, 13, and 19-22. Defense counsel made a continuing objection to the photographs at trial.

[9]Rule 16, Tenn. R. Crim. P., provides in pertinent part:
(1) Information Subject to Disclosure
. . .
(C) Documents and Tangible Objects. --- Upon request of the defendant, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the state, and which are material to the preparation of the defendant's defense or are intended for use by the state as evidence in chief at the trial, or were obtained from or belong to the defendant.

know, ahead of time. We just say, "Okay, there are photographs. Now, if you want to go there and get them produced fine." But there's no duty to produce photographs.

Sometimes we have hundreds of photographs, and that's why -- and Your Honor, I'm sure, has been in trial where we show a photograph to an attorney in a trial, and sometimes we'll come up to the bench and argue about the photograph. But what we do is we just let the attorney know that there's photographs.

This is not discoverable – the photograph. The only thing of it is, is that you just let them know that there are photographs. But the photograph itself, no, because we have no duty to develop the photograph. We may never develop the photograph, or we may. But, I mean, she can also go up to the photo lab and do it.

After hearing argument of counsel, the trial court concluded that Rule 16 does not specifically require that the photographs be given to the defendant as part of discovery. The trial court's ruling does little to resolve the issue before us. Clearly, the Rule does direct the State to permit inspection and copying of any photographs intended to be used in the State's case-in-chief or useful to the development of a defense.[10] However, the issue remains whether the State violated the discovery rules by only providing notification of the photographs.

Initially, we find that the appellant has waived this issue for failure to raise the issue prior to trial. See Tenn. R. Crim. P. 12(b)(4). Arrangements were made by which defense counsel was permitted complete access to the State's file. Thus, every discoverable item was available for inspection. General Henderson stated that, although the photographs were not developed, notification of the existence of the photographs was contained in the file. Upon examining the property receipts for the photographs contained in the discovery file, defense counsel did not initiate further inquiry as to the nature of the photographs nor did counsel further pursue acquiring or

---

[10]While we fail to find any authority expressly prohibiting the Shelby County District Attorney General's Office practice of delaying development of photographs until immediately prior to trial, we note that other jurisdictions have expressed the opinion that such practice by the State, although not technically a discovery violation, is not to be encouraged. See State v. Bizzle, 608 S.W.2d 111, 113 (Mo. App.), cert. denied, (Mo. 1980). Likewise, we fail to conclude that the benefits to the State accruing from the delay of development outweigh the defendant's right to inspect and copy the photographs. Additionally, we cannot sanction the prosecutor's proffered remedy in the present case that defense counsel has the obligation to develop the photographs. It is the obligation of the State, pursuant to Rule 16, to permit inspection of photographs which it intends to use as evidence in its case-in-chief.

inspecting the actual photographs. The State is not obliged to determine whether defense counsel is aware of each and every item in the file. That is the function of defense counsel to whom the file is opened. Failure to complain of the alleged discovery violation and to seek a remedy as soon as the defense learns of it may be treated as waiver.[11] See Bolton v. State, 617 S.W.2d 909 (Tenn. Crim. App. 1980); State v. Renner, No. 03C01-9302-CR-00034 (Tenn. Crim. App. at Knoxville, Sept. 12, 1994), aff'd by, 912 S.W.2d 701 (Tenn. 1995).

Notwithstanding the appellant's waiver of this issue, and assuming, *arguendo*, that a discovery violation did occur, the trial court did grant the appellant a recess after opening statements during which to review the challenged photographs. The appellant complains that the appropriate remedy is exclusion of the photographs from evidence. Initially, we note that prohibiting the introduction of evidence is not the exclusive means to remedy a discovery violation. The trial court has the discretion to permit inspection of the photographs or decide whatever remedy is just under the circumstances. See Tenn. R. Crim. P. 16(d)(2). See also State v. Smith, 926 S.W.2d 267, 270 (Tenn. Crim. App. 1995). Whether an exclusionary sanction is appropriate depends upon whether the defendant has actually been prejudiced in the development and presentation of his case by the prosecution's failure to make a proper and timely disclosure of the evidence in question and whether that prejudice cannot be otherwise eradicated by a continuance or means other than suppression. See State v. Garland, 617 S.W.2d 176, 185 (Tenn. Crim. App. 1981).

The appellant argues that the introduction of the photographs was extremely prejudicial as there were "numerous gory photographs of the decedent victim, and guns and other evidence obtained at Defendant's home." The appellant is mistaken as to the standard for determining prejudice. The inquiry is what prejudice has resulted

---

[11]The appellant does not dispute that the receipt for the photographs was contained in the discovery file. Clearly, defense counsel was given notice of the possibility of photographic evidence at trial. Accordingly, the most prudent action would have been for defense counsel to file a motion to compel discovery with the court.

from the discovery violation, not simply the prejudicial effect the evidence, otherwise admissible, has on the issue of a defendant's guilt. State v. Mitchell, No. 02C01-9702-CC-00070 (Tenn. Crim. App. at Jackson, Sept. 15, 1997) (citing State v. Cottrell, 868 S.W.2d 673, 677 (Tenn. Crim. App. 1992); Garland, 617 S.W.2d at 186). This court will not presume prejudice from a mere allegation. Moreover, prejudice arising from a discovery violation will not be found if it is shown that the defense was otherwise aware of the undisclosed evidence. The appellant cannot dispute that defense counsel reasonably should have known that the photographs did exist. In fact, defense counsel filed a motion to exclude photographs of the victim, which necessarily included some of the challenged photographs on October 16, 1996, approximately one month prior to trial. The appellant has failed to establish that he was prejudiced by the State's failure to timely disclose the actual photographic prints. Thus, considering that defense counsel was provided adequate time to examine the photographs before the State's case-in-chief, we are unable to conclude that the trial court abused its discretion by denying the appellant's request that the photographs be excluded. This issue is without merit.

## II. Motion to Suppress

A hearing on the motion to suppress the appellant's statement to the police was held on November 12, 1996, which was the first day of the appellant's scheduled trial.[12] The appellant testified that he was asleep on the couch at his mother's house when

---

[12] In addition to the motion to suppress, defense counsel apparently filed numerous motions one hour before the trial was to commence. Again, defense counsel's failure to raise these issues prior to trial resulted in waiver pursuant to Tenn. R. Crim. P. 12(b). Prior to the hearing, the State argued that the appellant's motions had been dismissed or withdrawn due to defense counsel's failure to appear at the previous motion date. The hearing on the motion to suppress was originally scheduled for hearing on October 18, 1996. On that date, defense counsel stated that she appeared in court, however, both the trial judge and the prosecutor were in trial. Defense counsel explained that the court clerk agreed to reset the hearing date for the motions. Defense counsel conceded that she was never able to confirm the date. Defense counsel also admitted that she made no effort to contact the court with regard to these matters. Although not entirely clear from the record, it appears that the motions were reset for November 7, 1996. Again, defense counsel failed to appear. Defense counsel explained that the clerk's office informed her that this date was a motion deadline and not a date to be heard, and therefore, she felt that she did not have to appear. Apparently, defense counsel had her secretary and a law clerk involved to some extent in these matters. We join in the trial court's admonition of trial counsel's conduct in her management of pre-trial motions.

police officers entered the home and took him into custody. He stated that he was not advised of his Miranda rights during this initial encounter. The appellant was then transported to the jail and questioned about the murder, but again, was not advised of his rights. He testified that one detective made repeated attempts to persuade him to sign some papers; implying that "it would be easier" if he signed the papers. The detectives also informed the appellant that he would not be able to telephone his mother until he signed the papers. The appellant testified that, over a two and one-half hour period, the detective made racial comments, "grabbed him around his throat," "spit in his hand," and "really just terrorized me." He also recalled one detective telling another that "since [the appellant] knew [his] rights, there wasn't no sense of just telling me." The appellant again was refused permission to telephone his mother. He stated that he was disturbed, upset and scared. Despite the fact that the detectives subsequently obtained a written waiver of rights and a transcribed statement by the appellant, the appellant maintains that he was not advised of his rights and that the answers provided on the statement were not his own. The appellant conceded that this was not the first time he had ever been arrested.

Detective John Botting testified that, on July 8, 1995, the appellant was brought to his office and, after being formally advised of his Miranda rights, executed a written waiver acknowledging that he understood his rights. Botting explained that the appellant was interrogated in an interview room and then was moved to the transcriptionist's office when he was ready to give a typed statement. Botting described the transcriptionist's office as being a small office with a computer screen. In describing the standard interview procedure, Botting explained that the subject sits down facing the computer screen while the interrogating officers stand beside the subject. An officer asks a question, and the transcriptionist types the question and then types the answer as given. Botting refuted the appellant's claims of coercion and further testified that at no time during "custodial interrogation" did the appellant indicate any concern or distress. Additionally, he denies that any racial comments were made and stated

that the appellant never asked to call his mother until after he had given his statement. The appellant's initial interview commenced at 11:45 a.m. and concluded sometime before 12:37 p.m. The typed interview began at 12:37 p.m. and was completed by 1:00 p.m. Elise Flowers, a civilian transcriptionist for the Memphis Police Department, confirmed the interview procedure and stated that she did not observe any evidence of coercion during the custodial interview.

At the conclusion of the hearing, the trial court determined that, "based on the evidence and the statements that have been given in this proceeding," the appellant voluntarily waived his Miranda rights and gave a statement to the detectives absent government coercion. The appellant contests this ruling.

The trial court's determination that a confession has been given voluntarily and without coercion is binding upon the appellate court unless the evidence preponderates against the ruling.[13] See State v. Odom, 928 S.W.2d 18, 22 (Tenn. 1996); State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). Under this standard, matters regarding the credibility of witnesses, the weight and value to be afforded the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial court as the trier of fact. Odom, 928 S.W.2d at 23. On appeal, the appellant bears the burden of demonstrating that the evidence preponderates against the trial court's findings. See State v. Tate, No. 02C01-9605-CR-00164 (Tenn. Crim. App. at Jackson, Dec. 3, 1997) (citation omitted).

The trial court obviously accredited the testimony of Detective Botting and Elise Flowers in finding a valid and knowing waiver of rights. Their testimony is supported by both the signed waiver of rights form and the appellant's subsequent signed statement. Considering the totality of the circumstances, see Stephenson, 878 S.W.2d

---

[13]Although the trial court's articulated findings regarding the motion to suppress are meager, we find that the court's recitation is minimally sufficient to accredit its findings. See, e.g., State v. Tate, No. 02C01-9605-CR-00164 (Tenn. Crim. App. at Jackson, Dec. 3, 1997).

at 545, the evidence shows that the appellant was properly advised of his rights, had the capacity to understand those rights, and the statement was not the product of coercion. Berkemer v. McCarty, 468 U.S. 420, 434, 104 S.Ct. 3138, 3147 (1984); Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612 (1966); State v. Middlebrooks, 840 S.W.2d 317, 216 (Tenn. 1992), cert. dismissed, 510 U.S. 124, 114 S.Ct. 651 (1993). After a review of the evidence presented at the suppression hearing, we conclude that the appellant has failed to meet his burden of demonstrating that the evidence preponderates against the trial court's finding. Thus, the motion was properly denied. This issue is without merit.

### III. Sufficiency of Evidence

In his final issue, the appellant contends that the evidence presented at trial was insufficient to enable a rational juror to find him guilty of premeditated first degree murder. Specifically, he asserts that there is no evidence to show planning or a previous formed design or intent to kill.[14] He argues that, at best, the evidence supports a charge of voluntary manslaughter. The State contends that the number of blows inflicted upon the victim, the absence of defensive and offensive wounds on the victim, and the appellant's confession establish that the appellant "lured the victim into the woods with the preconceived intention to kill her for ten dollars."

A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). It is the appellate court's duty to affirm the conviction if the evidence viewed under these standards was sufficient for any rational

---

[14]Because we have found the appellant's confession admissible, we reject his alternative argument that there is no evidence that "linked" the appellant to Demetrius Moten's murder.

trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, -- U.S. --, 115 S.Ct. 743 (1995); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993).

Once a homicide is established it is presumed to be second degree murder. State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The State, then, has the burden of proving the element of premeditation to elevate the offense to first degree murder.[15] Id. Premeditation necessitates "the exercise of reflection and judgment," requiring a "previously formed design or intent to kill." State v. West, 844 S.W.2d 144, 147 (Tenn. 1992).

The element of premeditation is a question for the jury and may be inferred from the circumstances surrounding the killing. State v. Gentry, 881 S.W.2d 1,3 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994). Because the trier of fact cannot speculate as to what was in the killer's mind, the existence of facts of premeditation must be determined from the appellant's conduct in light of the surrounding circumstances. State v. Wright, No. 01C01-9503-CC-00093 (Tenn. Crim. App. at Nashville, Jan. 5, 1996). Although there is no strict standard governing what constitutes proof of premeditation, several relevant circumstances are helpful, including: the use of a deadly weapon upon an unarmed victim; the fact that the killing was particularly cruel; declarations by the defendant of his intent to kill; and the making of preparations before the killing for the purpose of concealing the crime. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-542). Additional

---

[15]First degree murder, not committed in the perpetration of a crime, requires the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1995 Supp.).

factors from which a jury may infer premeditation include planning activities by the appellant prior to the killing, the appellant's prior relationship with the victim, and the nature of the killing. Gentry, 881 S.W.2d at 4-5 (citation omitted).

The State concedes that "[t]he fact that repeated blows were inflicted on the victim is not sufficient, by itself, to establish first degree murder." Brown, 836 S.W.2d at 542; see also State v. Darnell, 905 S.W.2d 953, 962 (Tenn. Crim. App. 1995). "Repeated blows can be delivered in the heat of passion, with no design or reflection." Brown, 836 S.W.2d at 542. Nonetheless, the State argues that the repeated blows inflicted on the victim coupled with his confession to police support a finding of premeditation. We disagree.

The proof established that the appellant and the victim were life-long family friends. Witnesses testified that, immediately prior to the incident, the victim walked with the appellant toward the Dunnavant Manor Apartments. No hostility between the two was observed. Ms. Moten made no attempt to flee nor did she call for help as the pair walked toward the wooded area. The appellant was unarmed at the time the couple entered the woods. The appellant's confession reveals that, after engaging in consensual sexual intercourse, the appellant and the victim began to argue over a ten dollar bill. The appellant hit the eighty-six pound victim with a stick, striking her approximately ten times. Both the appellant and the victim were highly intoxicated at the time of the incident. Although it was the State's position at trial that the appellant lured the victim into the woods for the purpose of killing her for ten dollars, there is simply no proof to support this theory, and it remains just that, a theory.[16] Based upon these facts, we conclude that there is insufficient evidence to support the jury's finding that the blows to the victim were a "previously formed design" and were inflicted in "the

---

[16]Clearly, the State's theory of the appellant's motive for the murder was robbery. We note that the appellant was not charged with the robbery of the victim, nor was he charged with murder committed in the perpetration of a robbery.

exercise of reflection and judgment." <u>West</u>, 844 S.W.2d at 147. Absent the element of premeditation, the appellant's conviction for first degree murder cannot stand.

Notwithstanding this conclusion, again, a homicide is presumed to be second degree murder. <u>Brown</u>, 836 S.W.2d at 543. Second degree murder is "a knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1) (1995 Supp.). Under the facts of this case, we find that the proof establishes that the appellant acted "knowingly" with an awareness that his repeated and forceful blows to the head and body of the victim were reasonably certain to produce death. <u>See</u> Tenn. Code Ann. § 39-11-106(20) (1995 Supp.). We conclude that there is evidence to support "knowing" conduct, and, therefore, a conviction for second degree murder.

## Conclusion

For the reasons set forth above, we reverse the appellant's conviction and vacate the accompanying sentence for first degree murder. The judgment of the trial court is modified to reflect a conviction of murder in the second degree. This cause is remanded to the trial court for entry of a judgment of conviction in accordance with this opinion and for re-sentencing consistent with the principles of sentencing.

_____
DAVID G. HAYES, Judge


CONCUR:


_____
WILLIAM M. BARKER, Judge


_____
JOE G. RILEY, Judge

17